CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 01 2009

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RAY LEE HOLLEY, JR., <br> also known as Amaru Amin-Jsej Shabazz, <br><br> Plaintiff, <br><br> v. <br><br> GENE JOHNSON et al., <br><br> Defendants. | Civil Action No. 7:08-CV-00629 <br><br> **MEMORANDUM OPINION** <br><br> By: Hon. Glen E. Conrad <br> United States District Judge |

The plaintiff, Ray Lee Holley, Jr., also known as Amaru Amin-Jsej Shabazz, is a Virginia inmate proceeding pro se in this civil action filed under 42 U.S.C. § 1983; the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq. ("RLUIPA"); and Virginia law. The case is presently before the court on the defendants' motion for summary judgment, in which they argue, inter alia, that they are entitled to qualified immunity with respect to certain claims. For the reasons set forth below, the court will deny the defendants' motion for summary judgment on the basis of qualified immunity. The court will take under advisement the defendants' remaining grounds for summary judgment.

I.  **Background**

Holley is incarcerated at Red Onion State Prison, where the events giving rise to this action allegedly occurred. Holley alleges that, on September 29, 2007, he was outside with several other inmates when prison officials ordered the plaintiff to submit to restraints. The prison officials charged that Holley was observed smoking a cigarette and he was therefore searched for tobacco products. The officers also searched the plaintiff's cell, where they confiscated a file folder purportedly containing Holley's religious materials and lessons. These materials were confiscated,

according to Holley, due to the fact that his religion, the Five Percent Nation of Islam, also known as the Nation of Gods and Earths, is labeled as a "gang" by the Virginia Department of Corrections ("VDOC"). Holley insisted that the materials were not gang related, and requested that prison officials review the confiscated materials themselves. Several months later, Holley submitted an application to be placed on the Common Fare Diet due to his religious beliefs. In his application, he stated that his religion is the Nation of Gods and Earths. His application was denied with the explanation that the "God of Earth is not a religion." (Compl. Ex. E).

In addition to Holley's claims arising from the denial of his request for the Common Fare Diet and the confiscation of his religious materials, Holley also asserts several claims resulting from his confinement in ambulatory restraints soon after the confiscation of those materials. On September 29, 2007, after his religious materials were confiscated and after he was returned to his cell, Holley flooded his cell and covered his cell door window. Prison officials thereafter returned to Holley's cell, placed him in ambulatory restraints, and stripped his cell of all property, bedding, and hygiene materials. He states that he remained in this condition from September 29, 2007 until October 1, 2007, for approximately forty-eight hours.

Liberally construed,[1] Holley alleges violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution; RLUIPA; and the Virginia Constitution and Virginia

---

[1] A pro se plaintiff's complaint must be "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal citations omitted). Pro se plaintiffs do not, however, have an absolutely free rein. See Weller v. Dep't of Soc. Servs., 901 F.2d 387, 391 (4th Cir. 1990) ("While pro se complaints may represent the work of an untutored hand requiring special judicial solicitude, a district court is not required to recognize obscure or extravagant claims defying the most concerted efforts to unravel them.") (internal citations and quotations omitted).

2

law.[2]

After filing his complaint, Holley submitted several discovery requests, which were denied without prejudice as premature by the magistrate judge. The defendants then moved for summary judgment, arguing, inter alia, that they are entitled to qualified immunity on certain claims and that they are entitled to summary judgment on the merits as to all claims. Following the filing of this motion, Holley's discovery requests were granted upon a motion for reconsideration. Because the defendants responded to Holley's requests with objections, however, Holley complained to the court, arguing that he needed the requested material to respond to the defendants' motion. The magistrate judge concluded that the defendants should not be required to respond to Holley's discovery requests until the court decided the issue of qualified immunity. Holley has now responded to the summary judgment motion, and the qualified immunity issue is ripe for disposition.

## II.    Qualified Immunity

Government officials are entitled to qualified immunity from civil liability for performing discretionary functions only insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a government official is entitled to qualified immunity, the court relies on a two-part test. Pearson v. Callahan, 555 U.S. __, __, 129 S. Ct. 808, 818 (2009) (holding that a court has discretion to determine the order of a qualified immunity analysis). Under the first prong, the court considers whether the facts alleged, taken in the light most favorable to the plaintiff, support a claim that the defendants violated the plaintiff's rights. Under the second prong, the court considers whether, at the time of the violation, the contours of the right

---

[2] The court's opinion is limited to the claims on which the defendants have specifically moved for summary judgment on the basis of qualified immunity.

3

Case 7:08-cv-00629-GEC-PMS   Document 63   Filed 10/01/09   Page 3 of 10   Pageid#: 478

were sufficiently clear that a reasonable official would understand that what he was doing violated that right. Anderson v. Creighton, 483 U.S 635, 640 (1987).

In this case, the defendants have specifically argued that they are entitled to qualified immunity with respect to Holley's Eighth Amendment claims, arising out of his confinement in ambulatory restraints, as well as Holley's free exercise and RLUIPA claims, arising out of the confiscation of religious materials and the denial of the Common Fare Diet. The court will address each group in turn.

### III. Claims Arising Out of Confinement in Ambulatory Restraints

According to Holley, on September 29, 2007, Lt. McCoy, accompanied by officers wearing riot gear and carrying an electric shock shield, arrived at the plaintiff's cell door after being informed that Holley had covered his cell door window and flooded his cell. (Comp. at 16.) Lt. McCoy then ordered the plaintiff to present himself at the "tray slot" of the door to be restrained. Although the plaintiff admits that he initially did not comply with this order, he states that he did comply within a matter of minutes, and submitted himself to be restrained. (Id.) Holley was then restrained by prison officials and escorted out of his cell, where he was stripped of his clothing and placed in a smock. He was then placed in "ambulatory restraints," which consisted of metal handcuffs, ankle shackles, a chain which connects the two, a black box placed on the handcuffs to restrict movement, and a master padlock placed on the black box. (Comp. at 17.)

Once restrained, Holley alleges that he was escorted back to his cell, which had been stripped of all personal property, bedding, mattress, and hygiene materials. He remained in these ambulatory restraints, wearing only a smock in a cold cell, for approximately forty-eight hours until the morning of October 1, 2007. Holley states that during this period of restraint, he experienced "extreme

4

difficulty in eating, sleeping, and using the toilet" and "personal humiliation and mental anguish." (Comp. at 18, 39.) He states that he recalls a few times when he urinated on himself and when he was forced to "eat using his face" because he was unable to wash his hands after using the toilet without risk of bacterial infection, given that he was deprived of toilet paper, running water, and other hygiene materials. (Reply Br. at 69.) He also states that the "restraints prevented [him] from standing fully erect and caused tremendous back pain and muscle stiffness/soreness from days of having to lean forward to move around" and that he experienced "swelling in his hands and wrists and severe pain" due to the weight of the chains for such an extended period of time (Reply Br. at 54, 70.)

According to Holley, he requested a mattress both nights, but was denied one each time, despite the fact that prison policy dictates that he be offered a mattress. Holley also states that he did not receive eating utensils, also despite the fact that he was supposed to receive utensils with his meals. Holley states that at no time during this confinement did he display any type of violent or threatening behavior. (Holley Decl. ¶ 6; Brock Decl. at 5.)

Upon release from the restraints, Holley complained of a swollen left wrist to the nurse who inspected him. Holley states that he did not seek additional treatment because he thought "it would be useless to request additional treatment and be charged $7.00 for something he could treat on his own with warm compresses and over-the-counter pain medications off of the prison commissary." (Reply Br. at 65.) He states that he continued to experience severe muscle stiffness, pain, and extreme soreness and tenderness in his back, neck, ... wrists, and ankles for about a week and a half after being released from the restraints. (Reply Br. at 65.)

The Eighth Amendment's prohibition on cruel and unusual punishment extends to the use of excessive force on inmates by prison officials. Hudson v. McMillian, 503 U.S. 1, 5 (1992);

5

Case 7:08-cv-00629-GEC-PMS   Document 63   Filed 10/01/09   Page 5 of 10   Pageid#: 480

Whitley v. Albers, 475 U.S. 312, 319 (1986). To succeed on an excessive force claim, an inmate must satisfy a subjective component—that the correctional officer acted with a sufficiently culpable state of mind—and an objective component—that the harm inflicted on the inmate was sufficiently serious. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). With respect to the objective component, an inmate "need not show that the force used caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action." Id. (quoting Hudson, 503 U.S. at 9). With regard to the subjective component, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. In determining whether a prison official acted with wantonness, a court should evaluate relevant factors such as: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response. See Whitley, 475 U.S. at 321.

The Eighth Amendment also guarantees the right to be free from cruel and unusual conditions of confinement. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). In order to state a claim of constitutional significance, a prisoner must satisfy both an objective and subjective component. Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997). To satisfy the objective component, a prisoner is required to demonstrate an "extreme" deprivation by producing evidence of a serious or significant physical or emotional injury or demonstrating a substantial risk of such harm. Id. To satisfy the subjective component, the prisoner must allege facts which show that prison officials acted with "deliberate indifference." Id.

Construing the facts in the light most favorable to Holley, the court concludes that the facts

6

alleged support an inference that prison officials used excessive force in their application of restraints and submitted Holley to cruel and unusual living conditions, both in violation of the Eighth Amendment. Under Holley's evidence, no use of force was required on this occasion, and his placement in a stripped cell and in shackles for approximately two days was greatly out of proportion to any need for force occasioned by his behavior. Holley alleges that, despite the fact that he ultimately complied with the officers' orders, he was confined in restraints and placed in a cold cell without adequate clothing, bedding, hygiene products, eating utensils, or running water solely with the intent to punish him. He further alleges that he was restrained in this manner for forty-eight hours without any disciplinary process, even though he remained passive and quiet the entire time. The foregoing allegations, viewed in the light most favorable to Holley, suggest that his detention in ambulatory restraints in these conditions for forty-eight hours was without penological justification. See Sadler v. Young, 325 F.Supp.2d 689, 703 (W.D. Va. 2004), rev'd on other grounds by 118 Fed. Appx. 762 (4th Cir. 2005) (unpublished). In addition, Holley has alleged that he suffered injuries, severe emotional and physical pain, and exposure to bacterial infection. Because it was clearly established at the time that inmates are protected from the unnecessary and wanton infliction of pain and injury without penological justification in the contexts of both excessive force and conditions of confinement, the court will deny the defendants' motion for summary judgment on the basis of qualified immunity.

IV. **Claims Arising Out of the Confiscation of Religious Materials and the Denial of the Common Fare Diet**

According to Holley, prison officials confiscated a folder containing his religious materials, despite the fact that those materials were religious in nature, not racially inflammatory, and did not

7

advocate violence. (Holley Decl. ¶ 5; Reply Br. Ex. 6.) He states that the essence of his religion, the Nation of Gods and Earths, is reading and learning religious lessons in order to obtain "the necessary knowledge, wisdom, and understanding." (Reply Br. at 26.) Holley alleges that these materials were confiscated solely because his religion is not recognized as a religion by the VDOC and is instead labeled as a gang. Holley claims that the VDOC policy is not rationally related to any legitimate objective, arguing that there is no evidence that the religion is linked to security concerns in Virginia and that the policy is instead based on the misunderstood nature of the religion and unfounded speculation. (Reply Br. at 25-26, 34.)

On January 24, 2008, Holley submitted an application to be placed on the Common Fare Diet, a diet which satisfies the needs of inmates whose religious beliefs forbid the consumption of certain food items. Holley alleges that he expressed his need for a religious diet and demonstrated the religious dietary requirements on his application. (Holley Decl. ¶ 7.) He states that prison officials denied his request for the diet, without considering his reasons for requesting it, basing their decision solely on the fact that the Nation of Gods and Earths is not a religion recognized by the VDOC. (Holley Decl. ¶ 7; Compl. Ex. E.)

Because of the VDOC policy, Holley alleges that "he cannot correspond with a religious advisor from the Nation of the Gods and Earths, he cannot receive newspapers, magazines, books, or any other type of publications associated with the Nation, he cannot attend religious meetings because the VDOC does not offer nor allow the Nation of Gods and Earths religious meetings or gatherings, he cannot receive a diet conforming to his religion, and . . . he has no ability whatsoever to practice and exercise his religious beliefs." (Reply Br. at 22-23.)

The Free Exercise Clause of the First Amendment prohibits the adoption of laws designed

8

to suppress religious beliefs or practices. Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). "[The First Amendment's] protections, including its directive that no law shall prohibit the free exercise of religion, extend to the prison environment. Id. (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987)). It is well established that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas v. Review Bd. Ind. Empl. Sec. Div., 450 U.S. 707, 714 (1981). Instead, the First Amendment protects sincere, but personal, religious beliefs, regardless of whether they are mandated by an established religious or held by a majority of a religion's followers. Id. at 715-16. When a prison official's decision infringes upon an inmate's First Amendment rights, the decision will nevertheless be upheld if it is "reasonably related" to promoting a legitimate penological interest. O'Lone, 482 U.S. at 349.

RLUIPA prohibits governments from taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that the imposition of that burden furthers a "compelling government interest" by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(a).

Construing the facts in the light most favorable to Holley, the court concludes that Holley has alleged a free exercise claim under the First Amendment and RLUIPA. Assuming the sincerity of his religious beliefs, he has alleged sufficient facts which, if proven, would demonstrate that the confiscation of his materials and the denial of the Common Fare Diet placed a substantial burden on his ability to practice his religion. See Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006). It is well-settled than an inmate's sincere, but personal, religious beliefs are entitled to constitutional and

statutory consideration, regardless of whether they are "shared by all of the members of a religious sect," Thomas, 450 U.S. at 715-16, or "compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(a). In this case, Holley alleges that his sincerely-held beliefs were not afforded the degree of individualized consideration that is required by well-settled law. Rather, it appears that the sole reason for confiscating Holley's materials and denying his request to be placed on the Common Fare Diet was the fact that the Nations of Gods and Earths is not considered a religion by the VDOC. (Compl. Exs. A, E.)

Thus, Holley has alleged violations of his rights under RLUIPA and the First Amendment arising out of the confiscation of his religious materials and the denial of the Common Fare Diet. Because it was clearly established at the time of the alleged violations that prison officials may not substantially burden an inmate's right to exercise his personal religious beliefs without some legitimate penological justification, the defendants are not entitled to qualified immunity with respect to these claims.

## V. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment on the basis of qualified immunity shall be denied. The defendants' motion for summary judgment on other grounds shall be taken under advisement. The court will enter this day a separate order regarding discovery.

The Clerk is directed to send certified copies of this opinion and the accompanying order to the plaintiff and defendants' counsel of record.

ENTER: This 1st day of October, 2009.

/s/ Glen Conrad
United States District Judge