CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE. VA
FILED

JUN 3 0 2010

JOHN F. CORCORAN CLERK
BY:
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

RAY LEE HOLLEY, JR., )
)
        Plaintiff, )
)    Case No. 7:08CV00629
)
v. )
)
)    **MEMORANDUM OPINION**
)
GENE JOHNSON, ET AL., )
)    By: **Glen E. Conrad**
        Defendants. )    **United States District Judge**

This civil rights action, filed under 42 U.S.C. § 1983 and the Religious Land Use and

Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5, is before the court

upon the Report and Recommendation of the United States Magistrate Judge, prepared pursuant

to 28 U.S.C. § 636(b). The magistrate judge recommends that the court grant defendants' motion

for summary judgment in part and deny it in part. Defendants have filed one objection and a

supplemental motion for summary judgment, while plaintiff has filed several objections to the

report. Upon de novo review of the portions of the report and the record pertinent to the

objections, the court adopts portions of the report, consistent with this memorandum opinion, and

grants defendants' motions for summary judgment.

## I. Background

Plaintiff Ray Lee Holley, Jr., an inmate in the segregation unit at Red Onion State Prison

who is proceeding pro se, brings this civil rights complaint, pursuant to 42 U.S.C. § 1983. He

alleges three groups of claims concerning:

       (a) the confiscation of religious materials necessary for his practice of his

professed religion, the Nation of Gods and Earths (also known as the Five Percent

Nation of Islam or Five Percenters),[1] in violation of the Constitution, RLUIPA, the Virginia Constitution, and state law;

(b) denial of his request to receive the Common Fare Diet (CFD) in keeping with his religious beliefs, in violation of the Constitution, RLUIPA, and the Virginia Constitution; and

(c) his being held in ambulatory restraints for 48 hours (from September 29 to October 1, 2007), in violation of the Eighth Amendment, the Virginia Constitution, and state law.

Defendants moved for summary judgment, and plaintiff responded. The court found that Holley had alleged facts which, liberally construed, stated constitutional and RLUIPA claims. (Mem. Op. Oct. 1, 2009.) Therefore, the court denied the motion on the ground of qualified immunity and referred the matter to the magistrate judge. After amendment of the complaint and completion of discovery, the magistrate judge issued her report, recommending that defendants' motions for summary judgment be granted in part and denied in part.

## II. Discussion

In a report pursuant to § 636(b), the magistrate judge makes only recommendations to the court. The recommendations have no presumptive weight, and responsibility for making a final determination remains with the court. Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The court is charged with making a de novo review of those portions of the report to which specific objection is made, and may "accept, reject, or modify, in whole or in part, the findings or recommendations" of the magistrate judge. 28 U.S.C. § 636(b)(1). In the absence of specific objections to the report, the court is not required to give any explanation for adopting the recommendation. Camby v. Davis, 718 F.2d 198, 199-200 (4th Cir. 1983).

---

[1] Although Holley refers to his religion as "the Nation of Gods and Earths," he does not object to the magistrate judge's finding of fact equating the Five Percenters and the Nation of Gods and Earths or indicate that his personal religious beliefs differ from the mainstream beliefs of the group. Therefore, for brevity's sake, the court will refer to Holley's asserted religious belief system and group as the Five Percenters.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indust., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## A. Classification of Five Percenters as a Security Threat Group (STG)

The magistrate judge recommends granting defendants' motion for summary judgment as to any claim that the Virginia Department of Corrections' (VDOC) designation of the Five Percenters as an STG violates Holley's right to free exercise of his religious beliefs under the First Amendment. (Report 7-9, 27.) Although his complaint raises arguments that Five Percenters are not a security threat, Holley does not object to this portion of the report. Moreover, he now expressly asserts that he "does not challenge the VDOC's security threat group classification" of the Five Percenters. (Dkt. No. 115 at 2.) Accordingly, the court will adopt this portion of the report without further discussion and will grant defendants' motion for summary judgment as to any aspect of Holley's complaint asserting that the VDOC's classification of the Five Percenters as an STG is unconstitutional or otherwise unlawful. Id. See also In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 468 (4th Cir. 1999) (upholding South Carolina prison policy designating Five Percenters as an STG and requiring that STG members remain in long-term segregated confinement).[2]

---

[2] As Holley notes, the In re Five Percenters decision did not address plaintiffs' claim in that case challenging a ban on possession of Five Percenter literature, because the issue "was settled by the parties after the district court enjoined the restriction." 174 F.3d at 468 n.2.

## B. Confiscation of Religious Publications

### 1. First Amendment

The magistrate judge recommends that defendants' motion for summary judgment be granted as to Holley's claim that confiscation of his religious materials violated his rights under the First Amendment. (Report 9-10.) She assumes for purposes of the report, without making a factual finding, that the Five Percenters are a religious group entitled to First Amendment protections.[3] She recommends granting summary judgment, however, based on this court's decision in Cartwright v. Meade, in which the court held that confiscation of Five Percenter materials pursuant to the VDOC's zero tolerance policy regarding gangs and gang identifiers is rationally related to furtherance of a legitimate penological interest. Case No. 7:08CV00250, 2008 WL 2944668 (W.D. Va. July 31, 2008) (unpublished) (citing other cases).

Holley objects to this recommendation. He argues that a genuine issue of material fact remains in dispute as to whether Five Percenters literature itself poses a threat to prison order, whether a blanket ban against inmates' possessing such literature, regardless of content, furthers prison security, and whether defendants considered the religious nature of his materials before confiscating them. Holley states that the official literature of the Five Percenters as a whole is called "The 120°," also known as "The Book of Life." According to plaintiff, this publication does not advocate violence and is as essential to the exercise of his faith as the Koran is to the Islamic faith, the Bible to the Christian faith, and the Torah to the Jewish faith. Among his exhibits, he offers replicas of the Five Percenter items taken from his cell and confiscated as gang-related.[4] He asserts that the confiscated lessons are the only means of spiritual guidance he

---

[3] Defendants argue that the Five Percenters are not a religious group, as indicated in the group's own publications, and are thus not entitled to First Amendment protections. Holley claims that the Five Percenters are a sect of the Nation of Islam. In declining to resolve the dispute over whether the Five Percenters are a religious group, the magistrate judge follows the Fourth Circuit's lead. See In re Five Percenters, 174 F.3d at 468.

[4] The replicated documents Holley submits include "The Supreme Mathematics," several lessons purportedly similar to the ones found in "The 120°," and the "(7) Stages of Wisdom." (Dkt. No. 57 at 90-96.) A symbol, consisting of a half-moon shape and a five-pointed star shape under the numeral

has available to him as a VDOC inmate, since STG designation prohibits him and other Five Percenters from meeting or corresponding with each other or with religious advisors or clergy. He asserts that his case is distinguishable from Cartwright, because the inmate plaintiff in that case did not allege that he was precluded from alternative means of practicing his religious beliefs, as Holley alleges. 2008 WL 2944668 at *2 n.2. The court finds no merit to Holley's objections.

In deference to the expertise of prison officials in managing the difficult challenges of prison administration, even when a prison policy substantially burdens an inmate's ability to practice his religious beliefs, the policy withstands a First Amendment challenge so long as it is rationally related to furtherance of a legitimate governmental interest. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safley, 482 U.S. 78, 89-91 (1987). In Turner, the Supreme Court identified four factors relevant to determining the reasonableness of a challenged prison regulation: (1) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (b) whether alternative means of exercising the asserted constitutional right remain open to inmates; (c) whether accommodating the asserted right will have a deleterious impact on prison staff, on other inmates, and on the allocation of limited prison resources; and (d) whether the regulation represents an "exaggerated response" to prison concerns, as reflected by the presence of less restrictive alternatives that impose only "de minimis cost to valid penological interests."[5] Id. at 89-91. "Where . . . prison administrators

---

seven, appears prominently in several places in these materials. This symbol is the Five Percenters' official trademark. "The Nation of Gods and Earths." Wikipedia, the Free Encyclopedia. Web. 16 June 2010. http://en.wikipedia.org/wiki/The_Nation_of_Gods_and_Earths. The defendants characterize the material confiscated from Holley's cell as "Crip gang literature and Five Percenter material." (Dkt. No. 34 at 31.)

[5] The magistrate judge bases her findings and conclusions on Cartwright, without discussing each of the four Turner factors as applied to the facts in Holley's case. In turn, the Cartwright decision did not expressly weigh all four Turner factors, one by one, in reaching its conclusion; however, the decision cites other cases considering these factors and finding in favor of prison officials. 2008 WL 2944668 at *2 n. 3 (citing other cases). In an abundance of caution, the court will discuss each of the four Turner factors in addressing Holley's objection to the magistrate judge's report.

draw distinctions between publications solely on the basis of their potential implications for prison security, the [regulation is] 'neutral'" as required under the first Turner factor. Thornburgh v. Abbott, 490 U.S. 401, 415-16 (1989).

Defendants' evidence indicates that the VDOC has established a zero tolerance policy for inappropriate or criminal behavior committed by groups of inmates meeting the statutory definition of a criminal street gang:

> "Criminal street gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, (i) which has as one of its primary objectives or activities the commission of one or more criminal activities; (ii) which has an identifiable name or identifying sign or symbol; and (iii) whose members individually or collectively have engaged in the commission of, attempt to commit, conspiracy to commit, or solicitation of two or more predicate criminal acts, at least one of which is an act of violence, provided such acts were not part of a common act or transaction.

Va. Code Ann. § 18.2-46.1. Such groups are classified as STGs, and their members are subject to severe restrictions of property or activity related to gang membership or involvement. Specifically, under the VDOC's policy regarding STGs,

> [t]he inmate population is prohibited from joining, recruiting for, associating with, participating in or acting in concert with any other individuals or group of inmates who may constitute a gang. Furthermore, [inmates] are prohibited from owning, creating, possessing, or passing to others any correspondence, documents, drawings, or symbols of any type that may indicate gang involvement.

(Dkt. No. 34 at 28.) The Five Percenters received STG designation in the VDOC, based on officials' findings that the group is a "separatist hate group that stresses black supremacy" and that the group has disrupted orderly operation of VDOC facilities in the past and actively attempts to recruit members of other STGs.[6]  (Id.)

---

[6] Defendants in the Cartwright case provided additional information about the Five Percenters that led to the group's classification as an STG within the VDOC:

[T]he Five Percent organization . . . is a radical offshoot of the Nation of Islam which claims to be non-religious in nature. The group uses secret codes to communicate with the prison environment, and uses a military type structure or hierarchy of command. The VDOC has taken measures to assess and identify a variety of security threat groups, which are groups which pose a threat to the security and integrity of penal operations. The Five Percent organization has been identified as a nationally known security threat group, and in order to curtail the organization of this group and to discourage inmate membership, the VDOC by policy prohibits inmate group meetings, correspondence, and

As stated, Holley expressly does not challenge the VDOC's classification of Five Percenters as an STG. This determination reflects officials' finding that the Five Percenters as a group present the same threats to prison security and order as do other criminal gangs. Holley also does not deny that officers confiscated his "religious" materials only because they were identified as Five Percenters material and not because of the content of the materials. In so doing, in keeping with the first Turner factor, officials furthered a neutral and legitimate security interest in eliminating all indicators of STG association in order to limit gang influence among the prison population at Red Onion State Prison.

In consideration of the second Turner factor, it is true that STG status prevents Holley from practicing some aspects of his religious beliefs that he might be free to practice outside the prison. In his unsworn response to defendants' motion, Holley summarizes those beliefs as a mandate to obtain knowledge, wisdom, and understanding about the "God" within himself by reading and contemplating Five Percenter literature and a duty to educate and enlighten others about the Five Percenter beliefs. Because the Five Percenters are classified as an STG, however, Holley asserts that he is prohibited from possessing any distinctive Five Percenter literature and from meeting or corresponding with other members of the Five Percenters, including religious leaders of the group.[7] Holley's submissions indicate, however, that his personal religious practice also includes self-reflection and self-development and the study of the Quran and the Divine Constitution of the Moorish Temple of America, inasmuch as the Five Percenters are related to the Nation of Islam and the Moorish Temple.[8] These practices are not prohibited by

---

possession of literature pertaining to this group. 2008 WL 2944668 at *2 n. 3. Other courts have also noted evidence of the Five Percenters' history of violent gang activity among prison populations around the country. See, e.g., Fraise v. Terhune, 283 F.3d 506, 511-13 (3d Cir. 2002) (reporting examples of violent and disruptive incidents involving Five Percenter inmates).

[7] Holley also asserts that STG status prevented him from receiving the religious diet he requested. This aspect of his religious claims will be separately addressed.

[8] In applying for the Common Fare Diet, Holley relied on the Quran and the Divine Constitution, which he possessed and which are not prohibited under the STG policy. (Dkt. No. 34, p. 74-80.)

the STG policy. Thus, under the second prong of the Turner analysis, while Holley suffers some severe limitations to his ability to practice his Five Percenter beliefs, he does retain other avenues for religious exercise.

Holley believes prison officials should ban only Five Percenter material that specifically advocates violence. Such an accommodation, however, would frustrate the goal of the zero tolerance policy to eliminate all indicators of gang affiliation, and reduce the effectiveness of the policy in combating the dangers that the STG poses to other inmates and staff. See In re Five Percenters, 174 F.3d at 470 (noting that because increased freedom for STG members could come "only with the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike," the court properly deferred to judgment of prison officials that Five Percenters should be segregated from general population) (quoting Turner, 482 U.S. at 92-93). Thus, the third and fourth Turner factors weigh heavily in favor of prison officials.

Given that at least three of the Turner factors weigh heavily on the side of defendant officials, the court agrees with the magistrate judge that the VDOC policy banning possession of written materials clearly identified with an STG is rationally related to legitimate penological interests and so withstands constitutional scrutiny under the First Amendment. See Fraise, 283 F.3d at 519 (upholding ban on Five Percenter newspapers against First Amendment challenge where inmates could possess, study, and discuss the "Koran"); Johnson v. Stewart, No. 1:07-cv-77, 2008 WL 828086 (W.D. Mich. 2008) (rejecting First Amendment challenge to prison's prohibition against inmates' possession of Five Percenter newspapers as associated with STG); Cooper v. Starling, 2003 WL 23350443 (E.D.N.C. 2003) (finding that prison officials' confiscation of medallion bearing Five Percenter symbol of crescent moon and five-pointed star did not violate prisoner's free exercise rights). For the stated reasons, the court will overrule Holley's objections, adopt the report's findings as to his constitutional claims regarding confiscation of his religious materials, and grant defendants' motion for summary judgment as to these claims.

## 2. RLUIPA

The magistrate judge finds genuine issues of material fact in dispute as to whether the STG policy's ban against Holley's possession of Five Percenter literature imposes a substantial burden on his religious practice and as to whether banning possession of Five Percenter material, regardless of whether the content itself poses a security threat, is the least restrictive means of furthering a compelling governmental interest as required for a RLUIPA claim under 42 U.S.C. § 2000cc(a)(1). (Report 13-14.) Therefore, she recommends denying summary judgment as to Holley's claim that the confiscation of his religious literature violates his rights under RLUIPA. Neither party objects to this recommendation or to the findings and conclusions on which it is based.

The magistrate judge's findings, conclusions, and recommendation regarding the RLUIPA claim, however, were rendered prior to receipt of Holley's concession that he is not challenging the VDOC's classification of the Five Percenters as an STG. Therefore, the court finds it necessary to analyze plaintiff's claims under RLUIPA, de novo.

RLUIPA prohibits governments from taking actions that impose a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that imposition of that burden furthers "a compelling governmental interest" by "the least restrictive means." 42 U.S.C.A. § 2000cc-1(a)(1)-(2). Its protections apply to programs or activities that receive federal monies, such as the VDOC.[9] § 2000cc-1(b)(1); Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir. 2006). Under RLUIPA, the inmate plaintiff bears the burden of proving that the challenged prison practice, or the denial of a religious accommodation, places a substantial burden on his exercise of sincere, religious beliefs.

---

[9] The United States Court of Appeals for the Fourth Circuit has ruled that RLUIPA does not authorize claims for money damages against an official who is sued in her individual capacity in reliance on the Spending Clause facet of the statute. Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009). As Holley does not allege any facts suggesting that his RLUIPA claim could qualify under the alternative, Commerce Clause section of the statute, see § 2000cc-1(b)(2), his claims for monetary damages under RLUIPA are foreclosed by the Rendelman decision.

§ 2000cc-2(b). Once plaintiff carries this burden, the government must prove that the imposition of the burden (or refusal to accommodate plaintiff's belief) furthers a compelling interest by the least restrictive means. Id.

In applying these principles to the facts of Holley's case, the court finds no genuine issue of material fact in dispute as to whether the STG policy furthers a compelling penological interest by the least restrictive means. As stated, Holley does not now challenge the VDOC's classification of the Five Percenters as an STG. Moreover, given the evidence that the Five Percenters have occasioned security concerns in VDOC facilities and have posed longstanding, severe security problems in other prisons around the country, the court concludes that the stated security interest in limiting the influence and growth of this threat group among the VDOC inmate population is compelling. Furthermore, the court concludes that the aspect of the STG policy prohibiting inmates from affiliating with a gang or from possessing any materials indicating gang affiliation furthers the stated security interest. Logic dictates that if inmates cannot easily identify which of their number are members of a particular gang, the influence of the gangs will be decreased.

Holley's RLUIPA argument is that banning all Five Percenter publications does not further the prison's interest by the least restrictive means, because the content of the publications does not pose a security threat. This argument ignores the fact that the documents seized from Holley are themselves closely identified with the Five Percenters group, just as the color-coded clothing worn by well-known city gangs, like the Bloods and the Crips, indicates membership in, or support for, those gangs. Holley's mere possession of the confiscated items, regardless of their written content, identified him as an STG member or supporter, thereby furthering the presence and influence of the STG itself. Allowing him to designate a friend or family member to receive the confiscated materials, as Holley requests, would deprive officials of the opportunity to use the materials in further investigation of Holley and other Five Percenter inmates and would leave open a risk that the literature would be returned to him surreptitiously.

The court agrees that permitting possession of such distinctive Five Percenter literature would undermine the effectiveness of the STG policy in reaching its goal to eliminate all indicia of gang affiliation as a means of eliminating the gangs' power and the dangers that accompany gang activity in prison. Holley retains the ability to practice other aspects of his beliefs, as discussed herein. Therefore, the court finds no genuine issue of material fact in dispute and concludes that defendants are entitled to summary judgment as a matter of law as to Holley's claim that confiscation of his religious materials violated RLUIPA.

### 3. Other claims

Holley does not object to the magistrate judge's recommendation that defendants' motion for summary judgment be granted as to his claims that confiscation of his Five Percenter literature violated the Equal Protection Clause or the Due Process Clause. (Report 14-16.) Therefore, the court will adopt this portion of the report and grant summary judgment for defendants as to these claims.

Holley objects to the magistrate judge's recommendation that the motion for summary judgment be granted as to Holley's claim that confiscation of his literature violated the due process, equal protection, and free exercise provisions of the Virginia Constitution, Article 1, §§ 11 and 16. (Report 16-17.) This objection has no merit. Virginia courts have "consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution." Rowley v. Commonwealth, 629 S.E.2d 188, 191 n. 2 (Va. App. 2006) (omitting citations). Therefore, the court will adopt this portion of the report and grant defendants' motion for summary judgment as to Holley's state constitutional claims regarding confiscation of his literature.

Defendants are also entitled to summary judgment as to Holley's related state law claim that the unlawful confiscation of his religious literature constituted conversion of his property.[10]

---

[10] In light of her determination that defendants' motion for summary judgment should be denied as to Holley's RLUIPA claim, the magistrate judge also recommends that summary judgment be denied as to his conversion claim. (Report 17.)

Conversion occurs after "the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." Economopoulos v. Kolaitis, 528 S.E.2d 714, 719 (Va. 2000) (emphasis added). Because the court has determined that confiscation of Holley's literature was not "wrongful" under the constitution and RLUIPA, he cannot maintain an action for conversion of that material. Id.

## C. Denial of the Common Fare Diet (CFD)[11]

### 1. First Amendment and RLUIPA

In Paragraph 26 of a numbered list entitled "Proposed Findings of Fact and Conclusions of Law" at the end of the report, the magistrate judge states that defendants' motion "should be denied insofar as Holley claims the denial of the CFD violated his constitutional rights or his rights under the RLUIPA." (Report 29.) (emphasis added). Defendants object to this recommendation, arguing that it is inconsistent with the magistrate judge's analysis and findings elsewhere in the report, indicating that defendants' motion should be granted as to Holley's claims under federal law regarding the denial of the CFD. (See Report 24-26, 29 ¶ 25.) In these earlier sections of the report, the magistrate judge finds that Holley had failed to present facts to prison officials or the court in support of his allegation that denial of the CFD meals imposed a substantial burden on his religious beliefs, an essential element of a claim under the Free Exercise Clause or RLUIPA. (Id.) Defendants ask the court to reject No. 26 of the listed findings on page 29 of the report, to adopt the earlier findings, and grant summary judgment as to the CFD claims. After de novo review, the court concludes that defendants' objection must be sustained.

Inmates have a constitutional right and a statutory right under RLUIPA to receive a nutritious diet in keeping with their sincere religious beliefs. Lovelace v. Lee, 472 F.3d 174, 198-99 (4th Cir. 2006); Ross v. Blackledge, 477 F.2d 616, 618-19 (4th Cir. 1973). To succeed

---

[11] Defendants' evidence indicates that the CFD is a special menu plan designed to accommodate inmates' religious dietary needs that cannot be met by the regular VDOC diet menu.

on a constitutional or RLUIPA claim in this context, however, an inmate must first demonstrate that the diet choices already provided to him by the prison substantially burden his religious practice.[12] See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 450 (1988) ("[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" are insufficient to state a claim under Free Exercise Clause); Lovelace, 472 F.3d at 187 (defining RLUIPA term "substantial burden" as one that "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs") (omitting citations).

Holley first applied for the CFD in January 2008, stating that his religion, Nation of the Gods and Earths, required him to "refrain from eating the processed meats and unnaturally grown foods served in the regular [VDOC] diet." (Dkt. No. 34 at 74-75.) In his application, he explained that the Nation of the Gods and Earths "is a sect of the Moorish Science Temple of America and is similar but slightly different from the Nation of Islam. But we do adhere to some of the teachings and practices of the Hon. Elijah Muhammad." (Id. at 74.) The CFD application form asked for documentation explaining and verifying his religious need to participate in the CFD. In response, Holley stated, "Yes, I have the Moorish Science Temple Divine Constitution and By-Laws. I also possess a Holy Quran which strictly prohibits the consumption of a lot of foods served in the regular diet." (Id.) Holley also stated that "the Divine Constitution is clear in its teachings that members are to keep their bodies clean and pure with water and refrain from all forms of pork and foods which are unnaturally grown." (Id. at 75.) He explained on the form that for the past several years at various VDOC institutions, he had received the vegetarian menu, but had eaten only the bread and vegetables.

---

[12] Prison officials need not provide an inmate with a special religious diet if he can voluntarily pick and choose among the items offered on the regular prison menu and maintain a nutritionally adequate diet in conformance with his religious beliefs. See Abernathy v. Cunningham, 393 F.2d 775, 778 (4th Cir. 1968).

The initial hearing officer and the warden both disapproved Holley's CFD request, stating as a rationale: "God of Earth is not a religion." (Id. at 72.) Holley appealed, and the Central Classification Services (CCS) representative also disapproved his CFD request, stating that CCS personnel had concluded from Holley's submissions that his request was not "religiously motivated," based on "[l]ack of adequate documentation that the religion to which you claim membership or interest has a requirement for the Common Fare Diet. Further, this religion is not recognized by the DOC."[13] (Id. at 73.)

Holley reapplied to participate in the CFD program in August 2008.[14] (Id. at 78-79.) This time, he described his religion as Nation of Islam and stated that he had been practicing this religion for almost four years. The warden approved him to receive the CFD. The CCS representative deferred the request on October 2, 2008, however, because Holley had listed a different religious preference in his January 2008 application for CFD participation. The CCS representative stated:

> CCS would like to see 6 months participation by inmate in religious services/programs/classes taking into account his seg[regation] status. CCS would like for subject to contact the Chaplain's office for religious guidance/literature/information. Upon resubmission please indicate if subject participated in Ramadan.

(Id. at 78.)

The record thus reflects that when Holley first applied for participation in the CFD in January 2008, his documentation did not include any literature on the Nation of Gods and Earths (Five Percenters) which indicated that adherents of that belief system should eat foods consistent with the CFD menu. Holley's application mentioned documentation from related religious groups, but did not explain the relationship between the dietary laws of these other groups and those of his stated religious preference. He also failed to explain in his application why he could

---

[13] Defendants' evidence indicates that the CCS has final authority to decide whether or not an inmate has demonstrated a religious need for the CFD.

[14] Holley raises no claim in this lawsuit concerning the deferment of his second request for CFD participation in October 2008.

not meet his religious dietary needs by continuing to receive the VDOC vegetarian menu. As he thus failed to demonstrate to VDOC decision makers that denial of the CFD substantially burdened his ability to practice his stated religion, neither the First Amendment nor RLUIPA required defendants to accommodate his dietary preference.[15] <u>Lovelace</u>, 472 F.3d at 187. Accordingly, the court concludes that defendants are entitled to summary judgment as a matter of law as to Holley's claims that denial of the CFD violated his rights under the First Amendment and RLUIPA. Defendants' objection to the magistrate judge's contrary recommendation will be sustained, and defendants' motion for summary judgment will be granted as to these claims.

### 2. Other claims

The magistrate judge makes a separate finding that denial of Holley's request for CFD participation <u>did not</u> violate the Equal Protection Clause of the Fourteenth Amendment. (Report 29 ¶ 24.) Her recommendation, however, states that defendants' motion should be <u>denied</u> as to Holley's "constitutional" claims related to his religious diet. (<u>Id.</u> at ¶ 26.) Earlier portions of the report discussing Holley's dietary claims, however, reflect sound reasoning in support of <u>granting</u> summary judgment on the Equal Protection claim, as well as the First Amendment and RLUIPA claims. Therefore, the court concludes that the magistrate judge's recommendation on page 29 to deny summary judgment as to the constitutional claims is a typographical error. Based on her finding that Holley suffered no equal protection violation when his CFD request was denied, the court will grant defendants' motion for summary judgment as to this claim.

Holley also asserts that denial of his CFD request violated his rights under Article 1, §§ 11 and 16 of the Virginia Constitution—the equal protection and free exercise provisions of this document. Defendants filed a supplemental motion for summary judgment as to these

---

[15] In denying defendants' motion for summary judgment on the ground of qualified immunity as to the CFD claim, the court relied on plaintiff's allegations regarding his discussions with prison staff. (Mem. Op. 7-10, Oct. 1, 2009.) Upon closer examination of the supporting information actually submitted by Holley, however, the court agrees that plaintiff's statements were not sufficient to make his case to CCS officials in 2008 and that denying him participation in the CFD did not substantially burden his religious practice.

claims. Holley received notification of this motion as required under <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975) and has responded. He argues that defendants waived their defense by failing to address the state constitutional claims in their earlier motion. The court finds, however, that granting leave for defendants to pursue their supplemental motion furthers the interests of justice and judicial economy. Inasmuch as the court has determined that Holley has not established that denial of his initial CFD request violated his rights under the Equal Protection Clause or the Free Exercise Clause of the United States Constitution, he cannot succeed on his claim that denial of the diet violated his rights under the analogous provisions of the Virginia Constitution. <u>Rowley</u>, 629 S.E.2d at 191 n. 2 (finding that Virginia Constitution provides protections "co-extensive with those in the United States Constitution"). Therefore, the court will grant defendants' supplemental motion for summary judgment as to Holley's state constitutional claims regarding his religious diet.

### D. Use of Ambulatory Restraints

Holley makes specific objections (1) to the magistrate judge's findings that he does not show sufficient injury to sustain Eighth Amendment claims for monetary damages for unconstitutional living conditions or excessive force related to defendants' use of ambulatory restraints,[16] (2) to her finding that he failed to state a due process claim related to defendants' use of ambulatory restraints, and (3) to her recommendation that summary judgment be granted for defendants as to these claims. Accordingly, the court must review these claims <u>de novo</u>.

---

[16] The magistrate judge recommends: (a) granting defendants' motion for summary judgment as to Holley's conditions claim, based on her finding that he failed to show any serious injury resulting from the conditions; (b) denying defendants' motion as to the excessive force claim, because failure to show serious injury is not decisive of such claims, <u>see</u> <u>Wilkins v. Gaddy</u>, 130 S. Ct. 1175, 1180 (Feb. 22, 2010); (c) granting defendants' motion as to Holley's due process claims related to ambulatory restraints; and (d) granting defendants' motion as to all claims for monetary damages, pursuant to 42 U.S.C. § 1997e(e), based on her finding of no physical injury.

## 1. Facts and Allegations

On September 29, 2007, at approximately 10:30 a.m., a prison official reported that Holley had been observed smoking on the recreation yard.[17] Staff escorted him to the shower and conducted a strip search. Officers reported finding a tobacco product in Holley's back pocket and confiscated it. While the inmate remained in the shower stall, staff conducted a shakedown of his cell to determine if he possessed additional tobacco or other contraband. Officers searched and inventoried Holley's property, and in the process, they found and confiscated tobacco items and a folder of written materials that they classified as "gang-related."[18]

A short time later, around 12:30 p.m., staff reported to Sgt. Hale that Holley had flooded his cell and covered his cell window. Officers turned off the water to Holley's cell. Sgt. Hale went to the cell and ordered Holley to uncover his window, but Holley did not comply. Lt. McCoy repeated the order for Holley to uncover his window, but the inmate did not comply. Holley had also blocked his tray slot, so officers could not see whether he had anything in his hands. Advised of the situation, Administrative Duty Officer Assistant Warden Rowlette authorized placing Holley in ambulatory restraints because of his disruptive behavior. Officers contacted medical and mental health staff, who advised that there were no medical or mental health reasons preventing the use of ambulatory restraints on Holley.[19]

Lt. McCoy and a cell extraction team gathered at 12:55 p.m. in front of Holley's cell. Lt. McCoy ordered Holley to back up to the tray slot so that handcuffs could be applied to his wrists. Holley uncovered his window and backed up to the tray slot as ordered. Officers escorted him

---

[17] The facts relevant to these claims are taken from plaintiff's pleadings and/or defendants' affidavits and are undisputed unless otherwise noted. While the report and the prior opinion contain summaries of the evidence, the court repeats this information here in order to put the legal issues in context.

[18] Holley denies that he was smoking or that officers found any tobacco items in his pocket or his cell. He points out that he did not receive a disciplinary charge related to tobacco products or other contraband.

[19] Medical staff reported that for medical reasons, no OC pepper spray could be used on Holley.

into the vestibule, where they ordered him to remove his clothing and footwear and gave him a safety smock to put on. He did so. Then, he knelt as ordered to allow the officers to apply leg irons to his ankles. Meanwhile, other officers cleaned and sanitized Holley's cell and removed his property, including his mattress, as required for strip cell status.

VDOC regulations state that ambulatory restraints are used to control assaultive, disruptive, or unmanageable inmates in situations where there is danger for them to injure themselves or others. The restraints are not to be used as punishment and are to be removed as soon as the inmate's disruptive behavior has ceased and officers determine that he is no longer a danger to himself or others. In any event, such restraints must be removed after 48 hours absent approval from the regional director.

An inmate in ambulatory restraints has his hands cuffed in front, double locked, with a black box covering the center keyhole portion of the cuffs. He also wears leg irons, with a security waist chain running through the black box on the handcuffs and down to the leg irons. The medical unit must advise security officers whether any medical reason prevents use of ambulatory restraints, and a nurse must examine the inmate to ensure that the restraints are appropriately applied and that two fingers can be placed under each cuff. Defendants maintain that an inmate in ambulatory restraints can stand completely upright, move around his cell, use the bathroom, wash himself, and eat, but cannot lift his arms above his head, swing his arms, or kick his feet. Holley asserts, however, that the ambulatory restraints prevented him from standing upright, which "caused tremendous back pain and muscle stiffness/soreness from days of having to lean forward to move around." (Dkt. No. 57 at 54.) He also asserts that the black box over the handcuffs "significantly restricts movement of the arms and wrist and causes severe muscle stiffness." (Id.)

Defendants state that an inmate in ambulatory restraints in strip cell status can request soap or toilet paper from staff when needed. These items are not left in the cell, however, to prevent inmates from using them for disruptive activities, such as covering the cell window or

18

stopping up the sink or toilet. Policy states that if the water to the inmate's cell is turned off while he is in ambulatory restraints, it should be turned back on every two hours, before meal breaks. Defendants also state that the water will be turned on if the inmate requests to wash himself or use the toilet. Defendants state that an inmate on ambulatory restraints is to be offered the use of a mattress at sleep time, approximately 10:00 p.m. each night. If he accepts the mattress, it will be removed from the cell the following morning at about 6:00 a.m.

After officers placed Holley in ambulatory restraints on September 29, 2007, a nurse checked the restraints. She was able to place two fingers under each cuff and noted that Holley did not voice any complaints to her. While Holley was in ambulatory restraints, staff checked on him every fifteen minutes and noted his status in a logbook. The cell check log for September 29 to October 1, 2007 included at least ten notations of Holley's disruptive behavior observed during status checks, including use of profanity toward staff, threatening staff with bodily harm if he was released, and nonverbal actions such as banging his restraints on items in his cell. The log book included notations indicating that at 10:00 p.m. on September 29 and 30, 2007, staff members offered Holley a mattress, but he refused it.

Inmates in ambulatory restraints are provided three meals per day on a tray that includes an eating utensil (a "spork") wrapped in a napkin. In some cases, the spork is omitted for mental health reasons. Records do not indicate that Holley received a special meal tray for mental health reasons while in restraints, so defendants' evidence is that he would have received a spork with his meals.

In his complaint and his response to defendants' motion, Holley alleges that he was held in ambulatory restraints for two days in a cold cell without adequate clothing, bedding, eating utensils, toilet paper, soap, other hygiene products, or running water; that he had difficulty sleeping "because of the agonizing stiffness of his muscles and the cold temperature" in the cell; and that he was unable to wipe himself or wash his hands after using the toilet, thereby exposing

him to a serious risk of a bacterial infection.[20] (Dkt. No. 1 at 16-26; Dkt. No. 57 at 52-79.) He alleges that on both nights during the restraint period, he asked officers for a mattress, but was not provided with one. Holley admits that he flooded his cell and that he initially did not comply with orders to back up to the tray slot to be handcuffed. He denies, however, that he displayed any disruptive behavior while he was being placed in ambulatory restraints, that he used vulgar language or made threats against staff while in ambulatory restraints, or that he banged the restraints on anything in his cell. Holley further asserts that defendants' status check notes indicating that he engaged in disruptive behavior while in restraints are "completely untrue." (Dkt. No. 57 at 63.)

Officers released Holley from ambulatory restraints on October 1, 2007, at approximately 10:10 a.m. A nurse checked him and noted that he had no injuries. Holley complained to the nurse about pain and swelling in his wrist. She did not note any swelling, but advised Holley to use warm compresses. The swelling went away within two or three days. Plaintiff states that he also experienced "severe muscle stiffness, pain, and extreme soreness and tenderness in his back, neck (from prolonged sitting or laying in awkward positions), wrists, and ankles" for about ten days. (Id. at 65.) Holley admits that he did not seek additional medical treatment in order to avoid being charged for it.

## 2. Eighth Amendment Claims

It is well established that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). Claims under the Eighth Amendment have two components: (1) the objective component, whether a prison official's alleged wrongdoing was "objectively harmful" enough to establish a constitutional

---

[20] Holley also alleges that "a few times when he was urinating . . . urine accidently ran down his leg because he was not in full control of the direction since the use of his hands [was] significantly restricted by the handcuffs and 'black-box.'" (Dkt. No. 57 at 55.) He also alleges that while in restraints, he asked repeatedly for toilet paper and eating utensils when he needed them, but officers refused to provide them.

violation, and (2) a subjective component, whether the official "act[ed] with a sufficiently culpable state of mind." Id. at 8 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The showing required for each of these components varies with the context in which the plaintiff's claim arises, and the nature of the objective component requires comparison to "contemporary standards of decency" in that context. Id. at 8.

### a. Conditions

In the context of prison living conditions, an inmate must establish by a preponderance of the evidence that the prison official acted with deliberate indifference (subjective component) to a substantial risk of harm (objective component). Id. "To the extent that [prison living] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). To prove deliberate indifference, the inmate must show that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that he actually drew that inference, and that he disregarded the risk by failing to take "reasonable measures" to alleviate the risk. Farmer v. Brennan, 511 U.S. 825, 835-37 (1994). "[T]o demonstrate that a deprivation is extreme enough to satisfy the objective component of an Eighth Amendment [conditions] claim, a prisoner must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (omitting internal quotations).

The length of confinement under the challenged conditions is also a factor to be considered. Hutto v. Finney, 437 U.S. 678, 686 (1978) (noting that confinement in "a filthy, overcrowded cell and a diet of [1000 calories per day] might be tolerable for a few days and intolerably cruel for weeks or months"). Cf. Hope v. Pelzer, 536 U.S. 730 (2002) (finding that inmate's allegations of being handcuffed to hitching post in hot sun for seven hours in awkward position with limited access to bathroom facilities and drinking water, as punishment after being disruptive during a work detail, satisfied subjective and objective elements of Eighth

Amendment conditions claim); <u>Beverati v. Smith</u>, 120 F.3d 500, 505 n.5 (4th Cir. 1997) (finding that inmates' alleged confinement for six months in unbearably hot cells, infested with vermin and smeared with urine and feces, with only cold food in smaller portions, less frequent changes of linen and fewer opportunities for recreation than the general population, did not state Eighth Amendment conditions claim based on lack of evidence that conditions "resulted in serious physical or emotional injuries or the grave risk of such harm").

Holly objects to the magistrate judge's finding that he fails to demonstrate injury. He points specifically to his allegations that being in awkward positions, without adequate heat, clothing, or bedding, caused severe muscle pain and stiffness for ten days. He also reemphasizes the evidence that he received no toilet articles, hygiene products, eating utensils, or running water, without penological justification as he was allegedly not misbehaving in any way, and that these conditions caused severe emotional pain and exposure to bacterial infection.

The court finds no merit to Holley's objection. Unlike the plaintiff in the <u>Hope</u> case, 536 U.S. at 730, Holley was free to change position extensively while in restraints, as he could stand or sit or recline on his bunk. If he chose to remain in awkward positions, he cannot blame his sore muscles on defendants. By his own admission, the injury to his wrist caused by the handcuffs did not require medical treatment and subsided completely within days. This evidence simply does not support a finding that the ambulatory restraints caused Holley any significant or serious injury, as required to state an Eighth Amendment conditions claim.[21] <u>Shakka</u>, 71 F.3d at 166.

Similarly, unlike the <u>Hope</u> case, Holley had regular access to food and liquids, could deposit his bodily waste in a toilet, and was not exposed to the hot sun without protection. He fails to demonstrate that any of the strip cell conditions, including deprivation of mattress and

_____

[21] In denying summary judgment on the ground of qualified immunity, the court relied on <u>Sadler v. Young</u>, 325 F. Supp.2d 689 (W.D. Va. 2004), <u>rev'd on other grounds by</u> 118 Fed. App'x 762 (4th Cir. 2005) (unpublished). (Mem. Op. 7, Oct. 1, 2009.) Upon consideration of the record which now exists in this case, however, the court concludes that the facts in Holley's case are distinguishable from <u>Sadler</u>, which involved a more restrictive form of restraints.

eating utensils, caused him anything more serious than temporary discomfort and embarrassment. The emotional effect of not being able to wipe himself, direct his urine, or eat with utensils does not compare with the level of humiliation at issue in Hope, where the inmate had no independent access to a toilet. Id. Simply put, the conditions and emotional stress Holley faced in ambulatory restraints are more analogous to the type of temporary discomforts and inconveniences at issue in the Beverati case, which the Fourth Circuit expressly found insufficient to support an Eighth Amendment conditions claim. 120 F.3d at 505 n.5. While the Beverati inmates were not cuffed and shackled, they were subjected to the adverse conditions for a much longer period of time than Holley. For these reasons, Holley's objection must be overruled. The court will adopt the portion of the magistrate judge's report finding that Holley suffered no serious or significant physical or emotional injury as a result of the conditions to which he was subject in ambulatory restraints and will grant defendants' motion for summary judgment as to this claim.

**b. Excessive Force**

In the context of excessive force, the appropriate inquiry for the subjective component of an Eighth Amendment claim is whether the prison official "applied [force" in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson, 503 U.S. at 6-7. The court must consider such factors as the amount of force used as related to the need for force, the threat reasonably perceived by the officers, and any attempts the officers made to "temper the severity of a forceful response." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

To prove the objective component of his excessive force claim, the inmate "must show that correctional officers' actions, taken contextually, were 'objectively harmful enough' to offend 'contemporary standards of decency.'" Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998) (quoting Hudson, 503 U.S. at 8). The objective component of an excessive force claim "can be met by the pain itself, even if an inmate has no enduring injury." Williams, 77 F.3d at 762 (omitting internal quotations). On the other hand, "[t]he Eighth Amendment's prohibition of

'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10 (omitting citation). "From the nature of an inmate's injury or lack of injury, the court may draw inferences "as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321. Prison administrators are entitled to broad deference in determining what policies and practices are necessary to preserve or restore security and order. Stanley, 134 F.3d at 634.

In short, the "core judicial inquiry [is] . . . the nature of the force—specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm." Wilkins v. Gaddy, ___U.S.___, 130 S. Ct. 1175, 1179 (2010). The extent of the injury the inmate suffered is relevant to both of these determinations: as a factor in determining "whether use of force could plausibly have been thought necessary in a particular situation" and as "some indication of the amount of force applied." Id. at 1178.

The magistrate judge correctly finds that failure to show serious injury does not, by itself, preclude an excessive force claim. Wilkins, 130 S. Ct. at 1180. Taking the evidence in the light most favorable to Holley, the court concludes, however, that the only reasonable inference to be drawn from the type and extent of the injuries Holley has proven is that application of ambulatory restraints for 48 hours is not a use of force that offends contemporary standards of decency so as to satisfy the objective component of an excessive force claim. It is undisputed that the restraints are designed and applied to limit an inmate's movements and not to inflict any measure of physical harm on him. The restraints themselves do not prevent the restrained inmate from changing position, stretching his muscles, eating his meals, sleeping, or using the toilet. To the extent that the restraints make these functions less comfortable and more difficult to execute effectively, they fall squarely among those conditions of prison life that are "restrictive and even

24

harsh" without rising to the level of unconstitutional punishment. Rhodes, 452 U.S. at 347. In response to an inmate's admittedly disruptive misconduct, a temporary limitation of an inmate's access to hygiene products, bedding, eating utensils, and freedom of movement, which causes the inmate no physical injury other than temporary discomfort and embarrassment, simply cannot qualify as a use of force that is "repugnant to the conscience of mankind."[22]

Because Holley fails to present evidence establishing the objective component of his excessive force claim, defendants are entitled to summary judgment on this claim without further consideration of the subjective component of the claim. As such, the disputes between the parties concerning Holley's conduct before and during the restraint period are not material to the court's decision here. Even if Holley, once restrained, did not exhibit any further physical or

---

[22] This finding comports with the past precedent of this court, which has repeatedly held that the extended use of ambulatory restraints which does not result in significant physical injury is a de minimis use of force that does not satisfy the objective component of an Eighth Amendment excessive force claim. See, e.g., Johnson v. O'Brien, Case No. 7:08CV00022, 2008 WL 2199275, *4 (W.D. Va. May 27, 2008) (Turk, J.) (finding no Eighth Amendment excessive force claim where plaintiff alleged use of ambulatory restraints for six hours caused lower back muscle strain and swollen wrists for which he sought no medical treatment); Henderson v. Commonwealth, Case No. 7:07CV00266, 2008 WL 204480, *8 (W.D. Va. Jan. 23, 2008) (Conrad, J.) (finding that use of ambulatory restraints for nine hours in cold cell without bedding or clothing was not Eighth Amendment violation where inmate alleged suffering only pain and stiffness for which he did not seek medical treatment); Blount v. Williams, Case No. 7:05CV00556, 2007 WL 951555, (W.D. Va. March 26, 2007) (Conrad, J.) (finding that use of ambulatory restraints for 24 hours was not excessive force where inmate suffered no injuries); Madison v. Kilbourne, Case No. 7:04CV00639, 2006 WL 2037572, *6 (W.D. Va. July 18, 2006) (Turk, J.) (finding de minimis injury resulting from inmate's being held in ambulatory restraints for 14 hours supporting conclusion that force used was also de minimis), aff'd on this ground, vacated in part and remanded as to another claim, 228 Fed. App'x 293, *1 (4th Cir. 2007); Teal v. Braxton, Case No. 7:04CV00406, slip op., 9-10 (W.D. Va. Feb. 27, 2006) (unpublished Report and Recommendation, adopted by district court judge's order) (Wilson, J.) (finding that de minimis injury caused by use of ambulatory restraints for 24 hours indicated amount of force was also de minimis and method of restraint was not repugnant to standards of decency; report adopted by district judge by order entered March 17, 2006); Keyes v. O'Brien, Case No. 7:06CV00437, slip op. at *4 (W. D. Va. July 27, 2006) (Kiser, J.) (finding no constitutional violation where inmate restrained for 30 hours in ambulatory restraints, because inmate suffered de minimis injury and nature of force was not repugnant to conscience of mankind).

These prior ambulatory restraints decisions relied, in part, on a line of cases decided by the United States Court of Appeals for the Fourth Circuit, which interpreted Hudson v. McMillian, 503 U.S. 1 (1992), as supporting a rule that an inmate cannot succeed on his § 1983 excessive force claim if his injuries were, objectively, de minimis. See Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998); Riley v. Dorton, 1159 F.3d 1159, 1166 (4th Cir. 1997); Norman v. Taylor, 25 F.3d 1259, 1962 (4th Cir. 1994). On February 22, 2010, the United States Supreme Court issued its decision in Wilkins, rejecting this Fourth Circuit interpretation of Hudson. 130 S. Ct. at 1178. As indicated in the parentheticals, however, in most cases, the court also considered the lack of injury as a factor in determining the objective element of the claim, just as Wilkins requires. Id. at 1178.

verbal behavior suggesting he would injure himself or others if not restrained, the nature of the restraints themselves and their temporary application did not result in more than a <u>de minimis</u> amount of force and were therefore not objectively harmful enough to support an excessive force claim.[23] The court will grant defendants' motion for summary judgment as to this claim.

### 3. Due Process

The magistrate judge recommends granting summary judgment as to Holley's claim that defendants violated his due process rights, in reliance on precedent from this court. <u>See Johnson v. O'Brien</u>, Case No. 7:08CV00022 (W.D. Va. 2009) (finding no due process violation where inmate was held six hours in ambulatory restraints and three days in a stripped cell without a hearing). Holley objects, asserting that he was entitled to a hearing at some point during the 48-hour restraint period, in order to demonstrate that the restraints were no longer warranted by his conduct. He argues that confinement in restraints for two days, coupled with the stripped cell conditions, was "atypical" so as to give rise to due process protections. The court cannot agree.

A prisoner has no constitutionally protected liberty interest in remaining in a particular housing assignment. <u>See Gaston v. Taylor</u>, 946 F.2d 340, 343 (4th Cir.1991). Changes "in a prisoners' location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison." <u>Id.</u> at 343. Liberty interests can arise from two sources, the Due Process Clause itself and state law. <u>Sandin v.</u>

---

[23] As stated, in denying defendants' motion on grounds of qualified immunity, the court relied on the <u>Sadler</u> decision to find that Holley's allegations stated a cognizable excessive force claim. 325 F. Supp.2d 689. Based on all the evidence now of record, including that adduced before the magistrate judge, the court finds Holley's excessive force claim to be materially distinguishable from the <u>Sadler</u> case, and from <u>Williams</u>, 77 F.3d 756, the case on which Holley primarily relies. The facts of these two cases vary in critical respects from Holley's situation. Inmate plaintiffs in <u>Sadler</u> and in <u>Williams</u>, who had all four limbs strapped to a bed, could not change position and did not have independent access to a toilet during the restraint period. 77 F.3d at 760; 325 F. Supp.2d at 690. In contrast, Holley's restraints did not prevent him from performing these functions whenever he desired. Additionally, Holley's evidence of pain resulting from the restraint period pales in comparison to the evidence adduced in <u>Sadler</u> regarding the adverse physical and mental effects caused by the 47-hour restraint period in that case. 325 F. Supp.2d at 698.

Conner, 515 U.S. 472, 484 (1995). The Due Process Clause may create a liberty interest when the restraint imposed upon an inmate exceeds his sentence in an "unexpected manner." Id. State prison policies may also create liberty interests that are protected by the Due Process Clause when they "impos[e][an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484-86 (holding that prisoner had no liberty interest in being free from segregated confinement because it did not exceed his sentence or constitute an atypical, significant deprivation under state prison regulations).

To determine whether an inmate possessed a liberty interest protected by the Due Process Clause in avoiding a form of restraints, the court must "compare the conditions to which [he was] exposed in [the challenged restraints] with those [he] could expect to experience as an ordinary incident of prison life." Beverati, 120 F.3d at 503. Despite dire conditions that the inmate plaintiffs in the Beverati case allegedly suffered in administrative segregation, the court found that while the conditions "were more burdensome than those imposed on the general prison population, they were not so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life." Id. at 504.

The Fourth Circuit has affirmed at least two judgments in which this court held that relatively lengthy periods in ambulatory restraints and confinement under conditions similar to those alleged by Holley were not so atypical as to create a protected liberty interest. See Madison v. Kilbourne, Case No. 7:04CV00639, 2006 WL 2037572, *6 (W.D. Va. 2006) (Turk, J.) (finding no due process violation where inmate was held in ambulatory restraints for 14 hours without a hearing), aff'd on this ground, vacated in part and remanded as to another claim, 228 Fed. App'x 293, *1 (4th Cir. 2007); Moore v. Miller, Case No. 7:08CV00614, 2009 WL 113258 (W.D. Va. 2009) (Conrad, J.) (finding no due process violation where inmate was held in ambulatory restraints for 26 hours without a hearing), aff'd, 349 Fed App'x 815 (4th Cir. 2009).

Holley offers nothing to support a different holding in this case. As a segregation inmate at a maximum security prison, he is in leg irons with his hands cuffed behind his back, every

27

time he leaves his cell, where he spends 23 out of 24 hours per day, unless he is in another secure area, such as the shower or recreation cage. When an inmate is transported to a situation where he needs to be in a sitting position in a chair, such as an attorney visit or a dental examination, supervisory officials may approve restraining him with his hands cuffed in front of his body and attached to a waist chain. Compared to an environment where such restrictive conditions are a daily occurrence, even for administrative reasons absent an inmate's misconduct, the court cannot find that the additional, temporary restriction of ambulatory restraints, which cause no physical injury and allow extensive freedom of movement, is so atypical as to "impose a significant hardship in relation to the ordinary incidents of life." Beverati, 120 F.3d at 504.

For the stated reasons, the court will overrule Holley's objection, adopt the portion of the report addressing this claim, and grant defendants' motion for summary judgment as to the Due Process claim regarding ambulatory restraints.

### 4. State Law Claims

Defendants did not move for summary judgment as to Holley's state law claims related to the ambulatory restraints incident.[24] As the court has determined, however, that defendants are entitled to summary judgment as to Holley's claims under federal law, the court declines to exercise supplemental jurisdiction over any state law claims which were raised in the complaint, but were not addressed in defendants' motions for summary judgment. Such claims will be dismissed without prejudice, pursuant to 28 U.S.C. § 1367(c).

### III. Conclusion

For the stated reasons, the court will adopt the portions of the magistrate judge's report that are consistent with this memorandum opinion, and will grant defendants' motions for

---

[24] Holley alleges that the use of ambulatory restraints against him violated his rights under Article I, Sections 1, 9, and 11 of the Virginia Constitution and constituted the tort of battery. He also alleges that the conditions of confinement to which he was subject while in ambulatory restraints violated Article I, Sections 1, 9, and 11 of the Virginia Constitution and constituted the tort of negligence under state law. (Dkt. No. 1 at 33-35.)

summary judgment as to all of plaintiff's claims under federal law. An appropriate order will issue this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and the accompanying final order to plaintiff and counsel of record for defendants.

ENTER: This _30th_ day of June, 2010.

United States District Judge